MELANIE LAPIDUS )
)
      Plaintiff, )
)
v. )   Cause No: 4:18 CV 01291 JCH
)
**LIFE INSURANCE COMPANY OF** )
**NORTH AMERICA** )
)
      Defendant. )
)

## MEMORANDUM

This matter is before the Court on Defendant Life Insurance Company of North America

("LINA")'s Motion for Summary Judgement (ECF No. 30), and Plaintiff Melanie Lapidus'

Motion for Summary Judgement (ECF No. 31). The Court will take up both motions together.

The motions are fully briefed and ready for disposition.

## BACKGROUND[1]

Plaintiff was employed by BJC Healthcare as Vice-President of Medical Benefits. (ECF

No. 37, ¶ 1, Defendant's Statement of Uncontroverted Material Facts ("Defendant Facts")). As

Vice-President of Medical Benefits, the Plaintiff "[p]lans, develops, and executes strategic

initiatives related to the development and growth of a managed care provider network for the

---

[1] Both Plaintiff and Defendant Submitted Statements of Uncontroverted Facts. (ECF No. 37, Defendant's Statement of Uncontroverted Facts; ECF No. 38, Plaintiff's Statement of Undisputed Material Facts). Defendant Submitted its Response to Plaintiff's Facts. (ECF No. 43, Defendant's Response). Plaintiff then Responded to Defendant's Response. (ECF No. 51, Plaintiff's Objections to Defendant's Response). In accordance with Local Rule 7-4.01(E), "[a] memorandum in support of a motion for summary judgement shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. *All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.*" The Plaintiff has not specifically objected to Defendant's statement of facts and therefore Defendant facts will be deemed admitted.

system." *Id.* ¶ 2, citing AR LINA0308. Defendant asserts that the job is sedentary, involving sitting, brief periods of standing and/or walking and lifting, carrying pushing and pulling 10 pounds occasionally. *Id.* ¶ 3, citing AR LINA0310.[2]

## I.     The Terms of the Policy

On January 1, 2013, Defendant issued Group Policy FLK-980126 ("the Policy") to BJC. Defendant evaluated Plaintiff's claim for short-term disability (STD) and long-term disability (LTD) benefits and her subsequent appeals. *Id.* ¶ 5. The Policy is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001 *et seq.* ("ERISA") and provides disability benefits to qualifying BJC employees. *Id.* ¶¶ 6-7.   Under the Policy, Plaintiff was designated as a Class 7 employee. *Id.* ¶ 9. Class 7 employees are defined as "[a]ll active, full-time employees classified as Vice President level or above with one or more years of service, regularly scheduled to work a minimum of 35 hours per week or 70 hours per pay period." *Id.* ¶ 8.

Under the "Schedule for Benefits for Class 7" disability is defined as:

> [T]he employee is considered disabled if, solely because of Injury[3] or Sickness,[4] he or she is: (1) unable to perform the material and substantial duties of his or her Regular Occupation; and (2) unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.[5]
> The Insurance Company will require proof of earnings and continued Disability.

*Id.* ¶ 10 (citing AR LINA0028).  The Policy also provides:

---

[2] Plaintiff states that she worked approximately 60 hours a week. She asserts that her normal work day lasted form 6:30am until 7:00pm. (Plaintiff Facts ¶ 4).

[3] Injury is defined as "[a]ny accidental loss or bodily harm which results directly and independently of all other causes from an Accident." (Defendant Facts ¶ 12, (citing AR LINA0054)).

[4] Sickness is defined as "[a]ny physical or mental illness." *Id.* ¶13 (citing AR LINA0055)).

[5] Regular Occupation is defined as the occupation the Employee routinely performs at the time the Disability begins. In evaluating the disability, the insurance company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or a specific location. (Defendant Facts ¶ 11, (citing AR LINA0055)).

> An Employee's coverage will end on the earliest of the following dates:...(3) the date the Employee is no longer in an eligible class...[or] (5) the last day of the month the Employee is no longer in Active Service[6] ... Disability benefits will be payable to an Employee who is entitled to receive Disability Benefits when the Policy terminates if he or she remains disabled and meets the requirements of the Policy.

*Id.* ¶14 (citing AR LINA0041). The Policy further permits Defendant to offset the monthly disability payment by any "Other Income Benefits" an employee receives, which include but are not limited to social security disability benefits. *Id.* ¶16 (citing AR LINA0043-44). The Policy also contains a provision called "Assumed Receipt of Benefits." *Id.* ¶17. The provision states:

> The Insurance Company will assume the Employee ... [is] receiving benefits for which they are eligible from Other Income Benefits. The Insurance Company will reduce the Employee's Disability Benefits by the amount from Other Income benefits it estimates are payable to the Employee... The insurance company will waive Assumed Receipt of Benefits ... if the Employee: (1) provides satisfactory proof of application for Other Income Benefits; (2) signs a Reimbursement Agreement; Provides satisfactory proof that all appeals for Other Income benefits have been made unless insurance company determines that further appeals are not likely to succeed; and (4) submits satisfactory proof that Other Income Benefits were denied.

*Id.* ¶ 17 (citing AR LINA0044-45).

## II.     Plaintiff's Claim for Short-term Disability Benefits.

In 2002, Plaintiff ruptured two discs in her lumbar spine. *Id.* ¶ 18. Plaintiff sought medical treatment and was advised that she could either have surgery or attempt to manage her condition through physical therapy and exercise. (Plaintiff Facts ¶ 17). Plaintiff declined to have surgery for her condition and instead utilized physical therapy, exercise, steroid injections and chiropractor visits to manage her condition. (Defendant Facts ¶ 19). In 2013, Plaintiff began seeking treatment from Dr. Jacob Buchowski, an orthopedist. (Plaintiff Facts ¶ 19). Plaintiff was diagnosed with degenerative lumbar scoliosis, and in 2015, the Plaintiff began experiencing

---

[6] Active Service is defined as "performing his or her regular occupation for the Employer on a full-time basis. *Id.* ¶ 15 (citing AR LINA0053).

numbness in her left leg.[7] (Defendant Facts ¶ 20). Dr. Buchowski advised Plaintiff that the feeling in her legs would, at some point, not return and that the nerves involved controlled more than just her ability to walk. (Plaintiff's Facts ¶ 24).

On January 18, 2016, Plaintiff had spinal fusion surgery. (Defendant Facts ¶ 21). Plaintiff applied for STD benefits through the Defendant on January 25, 2016. *Id.* ¶ 36. On January 26, 2016, Defendant approved Plaintiffs claim for STD benefits, with benefits payable as of January 23, 2016. (Defendant Facts ¶ 22, citing AR LINA0964-965). On January 29, 2016, Plaintiff underwent a second spinal surgery. *Id.* ¶ 23. The second surgery was to irrigate and debride a portion of the Plaintiff's spine. (Plaintiff Facts ¶ 30). On February 15, 2016, Plaintiff had a follow up appointment with Dr. Buchowski. *Id.* ¶ 34. He recommended that Plaintiff continue with physical therapy and recommended adjusting the Plaintiffs pain medication. *Id.*

Defendant extended Plaintiff's STD benefits until April 3, 2016, for "time for [additional] healing". (Plaintiff Facts ¶¶ 40-41). Defendant again extended Plaintiff's STD benefits through April 26, 2016. *Id.* ¶ 45. Defendant noted that Plaintiff's "job required her to have 'prolonged standing, walking, and sitting' that she was 'currently ambulating with a walker and need[ed] to take many Oxycodone per day to keep up with the pain' and she was '[u]nable to tolerate anything regarding sitting, standing'"[8] *Id.* ¶ 46, citing AR LINA0882. Defendant then extended Plaintiff's STD benefits through May 3, 2016, due to Plaintiff's "femoral nerve damage" and need to be "in a wheelchair" inability "to walk at all, [and] taking oxycodone" and *Id.* ¶¶ 47-48, citing AR LINA0884.

---

[7] Plaintiff states that her left foot began to go numb when she walked, and that the numbness began to travel up her leg to her waist and then to her right leg. (Plaintiff's Facts ¶¶ 21-22). By late 2015, Plaintiff asserts that she was only able to walk twenty steps before one or both of her legs would go numb; feeling would only return when she bent over or sat down. (Plaintiff's Facts ¶23).
[8] This report was sent to Defendant on May 2, 2016. (Plaintiff Facts ¶¶ 50-52).

On April 21, 2016, Plaintiff saw Dr. Chi-Tsai Tang who performed an EMG/Nerve Conduction Study on the Plaintiff and found "[a]cute/subacute left-sided femoral neuropathy." *Id.* ¶ 51, citing AR LINA0286-87. On April 27, 2016, the Plaintiff was seen by Dr. David Rubin and Dr. John Nay for an MRI. They further requested "[a] study of the left femur and thigh … but the patient was unable to tolerate further imaging."[9] (*Id.* ¶ 52; Defendant Response, at 13, citing AR LINA0293).

On May 2, 2016, Plaintiff called Defendant to report her condition and that she had been to the hospital on May 1, 2016 due to her inability to walk and the pain worsening and radiating from left leg to right leg. (Plaintiff Facts ¶49). Defendant subsequently extended Plaintiff's STD benefits through May 20, 2016. *Id.* ¶ 54. On May 4, 2016, Plaintiff began treatment at Washington University's Pain Management Center under the care of Dr. Michael Bottros for her "left lower extremity pain post spine fusion." *Id.* ¶ 57, quoting AR LINA0136. On May 9, 2016, Defendant extended Plaintiffs STD benefits through June 30, 2016. (Defendant Facts ¶ 24, citing AR LINA1046-1047).  On May 31, 2016, Plaintiff underwent a spine radiography.[10] (Plaintiff Facts ¶ 61).

A June 2, 2016 treatment note from Dr. Bottros stated:

> [Plaintiff] returns to [Pain Management Clinic] today for follow up of left knee/leg and low back pain. She previously underwent bilateral sacroiliac joint injections as well as left saphenous nerve injection. She states that these injections provided her with some significant relief. However, she believes that the injections are starting to wear off. She has weaned herself off oxycodone completely. Her only opioid currently is OxyContin

---

[9] The MRI report noted:

> The intrapelvic and extra pelvic sciatic nerves are normal in size and sign intensity. The left obturator nerve is normal and symmetric to the contralateral side. On the coronal images, there is edema throughout the retroperitoneal cause of the left femoral nerve. The nerve is not enlarged. There is no compressing lesion within the pelvis or proximal thigh. There is subacute denervation of the left quadriceps muscles, left sartious muscle and left obturator internus muscle.

(Defendant Facts, at 13 (citing AR LINA0293)(emphasis omitted)).

[10] The procedure was preformed by Dr. Jennifer Demertzis and the records were provided to the Defendant on June 13, 2016. (Plaintiff Facts ¶ 61).

> regimen which we have her wean off as indicated below. Overall, she believes that her overall improvement in pain relief continues to proceed well, waiting about 50% improvement in pain since her initial visit with us. She denied any new numbness, weakness, bowel or bladder incontinence.

(Defendant Facts ¶ 26, citing AR LINA0927). On June 9, 2016, a ClaimManager for Defendant, spoke with the Plaintiff over the phone. Plaintiff explained that she was "feeling the pain more than she was previously' and that she was 'unable to sit comfortably.'" (Plaintiff Facts ¶ 66).

On June 21, 2016, Dr. Bottros reported:

> Patient had left thermal radiofrequency ablation of sacral lateral branch nerves at left L5, S1, S2, S3 on June 2, 2016. She reports since that procedure she has experienced significant relief of pain, but the location of her pain has shifted. She states she has begun to experience pain the posterior aspect of the knee. Her pain is basically more than 50% reduced from her initial consult while she is 80% reduced from her initial opioids.

(Defendant Facts, citing AR LINA0136-137).Dr. Bottros gave the Plaintiff a steroid injection.

(Plaintiff Facts ¶ 69). On June 23, 2016, the Claim Manager spoke to the Plaintiff. *Id.* Facts ¶ 70. Plaintiff stated that the steroid injection had "made her pain worse" and was "unable to walk." *Id.* Plaintiff further stated that she was "'experiencing pain in her knee [and] her leg' and that her '[w]alking problems [had] quadrupled, or more'" and that she was "'unable to do anything at home' and  had to 'put ice at least once every hours [*sic*] in her sacroiliac joint due to pain.'" *Id.,* (quoting AR LINA01236-1238). Plaintiff reported that she "cannot work at all as her job requires her to have meetings all day and speak to providers." *Id.*  ¶ 71 citing AR LINA01238. The Claims Manager also spoke with a member of Dr. Buchowski's staff who stated that Plaintiff was "'not doing well at all' and was 'not released to [return to work]…' as her 'condition is worsening.'" *Id.* ¶ 72, citing AR LINA01232.

On June 29, 2016, Defendant extended Plaintiff's STD benefits through July 15, 2016, which was the last day on which she was eligible to receive STD benefits, and transitioned Plaintiff's claim to the LTD disability unit. *Id.* ¶ 73, citing AR LINA0890,1121-22.  A nurse case

manager for the Defendant noted that Plaintiff had "'significant back history including 9 level fusion' 'pain posterior knee,' 'antalgic gait, significant tenderness sacroiliac joint, [and] positive faber/ganseln bilaterally;' that she had 'severe limitations to ADL [activities of daily living] due to ongoing pain/ limits to function;' and that the '[m]edical [records] on file demonstrate[d] a function loss thru BTD [benefits termination date] as evidenced by gait deficits/ continued pain/treatments limiting ADL's post 9 level fusion.'" *Id.* ¶ 75, citing AR LINA0890; LINA001221-22). On July 11, 2016, Defendant reaffirmed its decision to extend STD benefits through the July 15, 2-16, benefits termination date. *Id.* ¶ 76.

### III.    Plaintiff's LTD Claim

Defendant received Plaintiff's application for LTD benefits on July 6, 2016. *Id.* ¶ 78. Plaintiff's claim for LTD benefits was assigned to Claims Manager Marquicha Ladell. *Id.* ¶ 79. Claims Manager Ladell requested information from BJC including copies of her pay stubs prior to Plaintiff's last day worked. *Id.* ¶ 80. In determining whether to grant LTD benefits, Case Manager Ladell reviewed the medical information in Plaintiff's STD claims file and the terms and conditions of the Policy. (Defendant Response, at 21).

On July 12, 2016, Plaintiff completed a "Disability Questionnaire & Activities of Daily Living" (ADL) form from the Defendant. (Defendant Facts ¶ 28). The ADL form asked the Plaintiff whether she was working, to which she responded "yes" and stated that she was working for BJC "10 hours per week in the office [and] 10 from home." *Id.* ¶ 29, quoting AR LINA0121-123. Plaintiff further answered that she expected to return to work July 18, 2016 but

noted she would be performing a modified job.[11] *Id.* Plaintiff also indicated that she was

receiving and would continue to receive 100% of her salary through July 15, 2016. *Id.* ¶ 31.

A July 19, 2016 treatment note from Dr. Buchowski states:

> [Plaintiff] has returned to work part-time (10 hours a week at work and 10 hours per week at home). She is no longer on oxycodone and is taking tramadol instead. She states that she is able to ambulate for relatively long distances without substantial leg pain or any significant leg numbness (which she could not do for approximately 2 years prior to surgery) … On physical examination, the patient is well-developed, well-nourished woman appearing her stated age. She is alert, oriented, and is in no acute distress. She ambulates with a normal gait. She is able to stand on her toes, stand on her heels, and is able to stand on each leg independently. She does not need to use any assistive devices. She is able to squat down and rise back up. She stands in normal coronal and sagittal alignment. Motor strength examination demonstrates normal motor strength throughout the lower extremities. Reflexes are normal and are symmetric throughout. Babinski sign is negative. There is no clonus, Her incision is healed… Plain radiographs demonstrate evidence of a posterior spinal fusion with instrumentation from T10 to S1/illium with a decompression from L3 to L5 and TLIFs at L4-L5 and L5-S1. Overall alignment looks excellent…

*Id.* ¶ 32, citing AR LINA0198-199.

On August 15, 2016, Dr. Bottros reported:

> [Plaintiff] returns to PMC [pain management clinic] today for continuing low back pain and LLE pain. On her last visit on 7/25/16 she had thermal RF performed on the genicular nerves of the left knee. She states that she is no longer experiencing pain directly over the knee, but she has begun to experience pain superior and inferior to the knee which she states wraps all around the leg. She states she had continued to experience some relief with naltrexone.
>
> She reports she recently purchased Quell pain relief devise to use on her left knee. She states it has been providing great relied. She states her pain can be as high as an 8/10 in the L knee, but with the Quell devise it goes down to 2/10. She rates the pain 5-6/10 in her low back and states that although in the past it was located primarily on the left side, she has begun to experience more main on the right as well recently which has been gradually worsening. Her last bilateral SI injection was three months ago. She states her pain is exacerbated by movement and relieved by ice.

*Id.* ¶ 33, citing AR LINA0212-213.

---

[11] Plaintiff asserts that her modified work schedule was at the recommendation of her treating physician. (Plaintiff Facts ¶ 77). Defendant states that Plaintiff self-reported these facts in her appeal letter on April 20, 2017. (Defendant Response, at 20).

Defendant approved Plaintiff's LTD claim on August 18, 2016.[12] (Defendant Response, at 22). Defendant's rationale for approving Plaintiff's LTD benefits was stored in Workbench. (Plaintiff Facts ¶ 86). The Workbench entry states:

> 8/17/16 CM recommends approving claim based on STD staffing on 7/11/16, which states medical on file demonstrates a functional loss through BTD (7/15/16) as evidenced by gait deficits/continued pain/treatments limiting ADL's post nine-level fusion."

*Id.* ¶ 87, citing AR LINA001113.

## A. Defendant Stops Payment of LTD Benefits

On August 18, 2016, Defendant requested Plaintiff's last two paystubs from BJC to calculate her LTD benefit amount. (Defendant Facts ¶ 38, citing AR LINA0171). Defendant received those paystubs on September 7, 2016. *Id.* ¶ 39, citing AR LINA0231. Defendant then followed up with BJC because Plaintiff had been receiving her full time pay through 8/26/16. *Id.* ¶ 40. BJC alerted Defendant that Plaintiff was an exempt employee who receives full time pay even when working part time. *Id.* ¶ 41, citing AR LINA0229.

The Policy's definition of Disability requires the employee to be unable to earn 80% of her indexed earnings. On September 20, 2016, Defendant notified Plaintiff that her benefits were not payable. *Id.* ¶¶ 41-42. Plaintiff states that the modified work arrangement was not satisfactory to BJC and that she was terminated on September 18, 2016 effective December 31, 2016. (Plaintiff Facts ¶108, citing AR LINA0205). [13] In a letter dated November 9, 2016, the Plaintiff reported to Defendant that she ceased work for BJC effective on December 31, 2016. (Plaintiff Facts ¶117). Plaintiff contends that while Defendant never paid any LTD benefits to Plaintiff it would have done so upon confirmation of Plaintiff's salary. (Plaintiff Facts ¶ 91).

---

[12] Plaintiff states that her LTD claim was approved on August 17, 2016. (Plaintiff Facts ¶ 86).

[13] Defendant denies that the cited document, AR LINA0205 supports allegations in the above paragraph. Defendant admits that Plaintiff self-reported her inability to perform her job in an April 20, 2017 appeal letter and in a November 17, 2017 appeal letter. Plaintiff did cease work on December 1, 2016. (Defendant Facts, at 28; AR LINA 0318; AR LINA 0470.

### B. Defendant Denies Plaintiffs LTD Claim

On December 1, 2016, Defendant denied Plaintiffs LTD benefits claim. (Plaintiff Facts ¶ 134). On April 20, 2017, Plaintiff submitted an appeal of Defendant's denial of her LTD benefit claim. On May 22, 2017, Defendant again denied Plaintiff's claim. *Id.* ¶ 191. On November 17, 2017, Plaintiff filed a second appeal. *Id.* ¶ 203. On February 7, 2018, Defendant denied the Plaintiff's second appeal. *Id.* ¶ 239. The present case arises out of the Parties' dispute over Plaintiffs LTD benefits.

### SUMMARY JUDGEMENT

The Court may grant a motion for summary judgement if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256. In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable

inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id.* at 249.

## DISCUSSION

The Eight Circuit has held that, "[u]nder ERISA, a plan participant may bring a civil action to 'recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" *Pralutsky v. Metropolitan Life Ins. Co.*, 435 F.3d 833, 837 (8th Cir. 2009), quoting 29 U.S.C. § 1132(a)(1)(B), *cert denied*, 549 U.S. 887 (2006). "[T]he district court reviews *de novo* a denial of benefits in an ERISA case, unless a plan administrator has discretionary power to construe uncertain terms or to make eligibility determinations, then review is for abuse of discretion." *Ristenhouse v. UnitedHealth Group Long Term Disability Ins. Plan*, 476 F.3d 626, 628 (8th Cir. 2007)(emphasis omitted)(citation omitted). Here neither party contends that the Policy grants Defendant such authority, so the standard of review is *de novo*.

On summary judgement, Plaintiff argues that she was entitled to LTD benefits because the Record demonstrates that Plaintiff cannot perform the duties of her job. (ECF No. 36, at 21-22). [14] Plaintiff specifically asserts that Defendant should not have changed its determination regarding Plaintiff's disability absent a substantial change in her condition. *Id.* at 24. Conversely, Defendant argues that its decision to deny Plaintiff's LTD claim should be upheld. (ECF No. 32, at 15). Defendant asserts that "[t]he crux of the dispute is whether the Plaintiff is able to perform the sedentary work duties associated with a job like hers in the national marketplace." *Id.* In support thereof, Defendant states that it properly relied upon conclusions found in medical

---

[14] ECF page numbers and numbers by Plaintiff at bottom of each page do not align. The Court's citations are to the ECF page numbers.

reviews and vocational analyses. *Id.* Defendant additionally asserts that its physician reviews were thorough and reliable. *Id.*, at 17.

The Administrative Record in this case contains an extensive amount of medical records upon which the decision to deny Plaintiff's long-term disability benefits was made. The question before the Court is whether the Plaintiff was disabled under the terms of the Plan. "On a *de novo* review of a benefits denial, 'a trial court *must* consider all of the provisions of a policy in question if those provisions are proffered to the trial court as a reason for the denial of coverage,' even where 'not relied upon by the plan administrator at the time the denial was made.'" *Michael v. American Intern. Group, Inc.*, 2008 WL 4279582 at *17 (E.D. Mo. Sept. 15, 2008)(quoting *Hillstrom v. Kenefick*, 484 F.3d 519, 528 (8th Cir. 2007)(quoting *Weber v. St. Louis Univ.*, 6 F.3d 558, 560 (8th Cir. 1993)). In conducting *de novo* review, the Court "owes the administrator no deference, however the administrator's decision is still the decision under review." *Michael v. American Intern. Group, Inc.*, 2008 WL 4279582, at *17*, citing *Niles v. American Airlines, Inc.*, 2008 WL 711630, at *5 (10th Cir. March 17, 2008). The Court must then determine "whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review". *Id.* Therefore, the Plaintiff must carry the burden to show that she was disabled under the meaning of the plan. *Id.*

Under the provisions of the Policy, an employee is Disabled under the Policy if she is unable to perform the material and substantial duties of her Regular Occupation and cannot be receiving in excess of 80% of her indexed earnings. Plaintiff's job profile noted that the Plaintiff would have to lift weights up to 10 pounds and would have to sit twenty-six to seventy-five percent of the time. (Defendant Response, at 11, citing AR LINA1045)). The parties do not dispute that after September 20, 2016 Plaintiff was not receiving 80% or more of her salary.

Defendant asserts however, that the Administrative Record shows that Plaintiff was not disabled from December 2016 through November 2017. (ECF No. 32, at 19). In determining whether the Plaintiff was disabled, the Court first looks to the Plaintiff's status at the time her initial LTD claim was approved on August 18, 2016.

## I.      Specific Facts Raised on Appeal

### A.  Defendant's Denial of LTD Benefits

Following its approval of Plaintiff's LTD benefits, the Defendant continued receiving medical information on the Plaintiff. On or about August 26, 2016, Dr. Buchowski completed a Medical Request Form for Plaintiff. (Defendant Facts ¶ 47, citing AR LINA0194-196). Dr. Buchowski found that Plaintiff could not bend, twist, lift more than 15 pounds, push, pull, or stay in one position for more than 30 minutes at a time. *Id.*  Dr Buchowski opined that the Plaintiff could "return on a part time basis, with limited hours from home and occasional short trips to the office. Her pain limits her from being able to return to fulltime work." *Id.* ¶ 49, citing AR LINA0194-196. Dr. Buchowski additionally notes on Plaintiff's Physical Ability Assessment that Plaintiff could not sit, stand, or walk more than two and a half hours per day, cannot reach overhead or below the waist at all, and could reach at desk level up to five and a half hours per day. Plaintiff could lift or carry objects no more than 10 pounds only up to 5.5 hours per day and could push and pull up to fifteen pounds for no more than two and a half hours per day. Dr. Buchowski further explained that a spinal fusion patient would need to take precautions from bending or twisting or heavy lifting for up to a year following surgery.  (AR LINA0195-96). Plaintiff also submitted medical records from July, August, October and November 2016 that indicate that she was still reporting continual pain to Dr. Bottros, that some pain management

therapies, such as steroid injections, provided temporary relief but that her pain kept returning. (Plaintiff Facts ¶¶ 102-104,127, 129-30).

LINA provided Plaintiff's medical records to Dr. Steven St. Clair, Occupational Medicine, for review. (Defendant Facts ¶ 50, citing AR LINA0075-76). Dr. St. Clair reviewed records from Dr. Buchowski and Dr. Bottros, including Medical Request Form and Physical Ability Assessment completed by Dr. Buchowski. *Id.* ¶ 51, citing AR LINA0075-76.

Dr. St. Clair concluded:

> The treating provider's opinion is not well supported by medically acceptable clinical or laboratory diagnostic techniques and is inconsistent with the other substantial evidence in the file because:
>
> Available medical documentation described [Plaintiff] with chronic back pain status post thoracolumbar fusion and laminectomy 1/18/16 with 1/29/16 revision laminectomy L3-4 but does not describe measured examination findings, imaging or test results that support functional limitations that preclude fulltime occupational function as specified. This includes ON's Dr. Buchowski and Dr. Bottros including 2/15/16 ON describing reasonably normal gait with mild left quadriceps weakness, EMG/NCV 4/19/16 noting left femoral neuropathy, 4/27/16 MRI pelvis describing edematous left femoral nerve, and ON Dr. Bottros 6/21/16, 7/1/16, 7/15/16, 8/15/16 and 10/4/16 which describe an antalgic gait and S1 tenderness, findings which do not preclude full time occupational function as specified.
>
> Duration of disability has exceeded the maximum guidelines provided by the widely accepted external resource from the Reed Group for described conditions without evidence of complication, co-morbidity, or ongoing impairment-lumbar fusion 84 days.
>
> There are no documented medical findings to indicate untoward effects of medications.
>
> In my opinion with a reasonable degree of medical certainty, I am able to answer the questions below as follows, after assessing the combined effect of all conditions for their impact on the whole person:
>
> - Is [Plaintiff] functionally limited? Yes. If so, describe how [Plaintiff] is functionally limited. No lifting over 10 pounds, occasional standing and walking.
> - Considering [Plaintiff]'s functional limitations and the treatment(s) required for their condition(s), what medically necessary activity restrictions are appropriate? [Plaintiff] is at least capable of constant sitting, frequent reaching, grasping, and fine manipulation as well as occasional standing, walking, and lift/push/pull/carry up to 10lbs.

*Id.* ¶ 52, quoting AR LINA0075-76. Defendant then requested an internal occupation analysis review to determine if the Plaintiff could perform her job with Dr. St. Clair's restrictions and limitations. *Id.* ¶ 53, citing AR LINA0073-74. The analysis was performed by Randy Norris, a rehabilitation specialist. *Id.* ¶54. He concluded:

> Review of the Directory of Occupational Titles (DOT) indicates that the customer's occupation is performed at the Sedentary physical demand level (PDL). Per DOT, this occupation would require occasional reaching, handling, fingering, and no climbing, balancing, stooping, kneeling, crouching, or crawling. Customer's occupation is Vice President…Per the 11/28/16 MD staffing by Dr. St. Clair, the given L&R's [limitations and restrictions] are consistent with the required demands of this occupation."

*Id.* ¶ 54, quoting AR LINA0073-74. Plaintiffs claim for LTD benefits was denied on December 1, 2016.

## B. Plaintiff's First Appeal

On April 20, 2017, Plaintiff submitted an appeal of Defendant's denial of her LTD benefit claim. (Plaintiff Facts ¶ 148). In her appeal Plaintiff included the following medical information:

> (1) March 29, 2017 letter from Dr. Buchowski
> (2) Universal Health Report
> (3) Functional Capacity Evaluation
> (4) Medical Records from office visits and procedures with Dr. Bottros.

*Id.* ¶149. The March 29, 2017, letter from Dr. Buchowski stated that:

> [Plaintiff's] postoperative course has been made difficult by the development of sacroiliitis along with left femoral, saphenous, and genicular nerve neuropathy. These complications have led to sustained pain and loss of function despite a continuing multi-modality treatment plan which includes physical therapy, injections, medications, TENS unit, etc. As a result, she has been unable to perform her job duties as previously required secondary to pain and difficulty standing and ambulating. At this point it is unclear if and when this will improve, and consideration should be given to her long-term disability appeal.

(Plaintiff Facts ¶ 150, quoting AR LINA0321)(emphasis omitted). Plaintiff's Universal Health Report states that as of April 16, 2017, the Plaintiff was actively suffering from pain in extremity, pain in left knee, chronic pain, Sacroiliitis, lower back pain, femoral neuropathy, neuralgia, left knee pain, and cervical disc displacement. *Id.* ¶ 151 citing AR LINA0322-33.

The Functional Capacity Evaluation (FCE) was conducted on January 23, 2017 by Athletico Physical Therapy. (Plaintiff Facts ¶154).   Before the FCE began Plaintiff reported having "[t]ranslumbar aching into the L hip and L buttock stabbing and burning. Aching of the L lateral lower leg. 'Constriction' of the circumferenial L knee. The client reports the lowest functional pain score in the last 30 days is a 4/10, worst functional pain score in last 30 days is 7/10, and current…is 5/10." (AR LINA0331).   "[Plaintiff] requested termination of testing with additional observable movement patterns at 3 hours suggesting that she can likely work on 1/3 days with up to 15# lifting, 5# carrying; frequent sitting with ability to vary position each 30 minutes; frequent reaching; occasional standing, walking, and lower level movements. The FCE noted that Plaintiff "could have performed at modestly higher levels than willing during musculoskeletal and functional testing" (AR LINA0328). Following the FCE Plaintiff had anterior thigh discomfort… [her] [g]ait was increasingly antalgic… [p]ain reported post testing was rated at 6/10." (AR LINA0331). Plaintiff's Waddell test indicated a positive finding for regional weakness. (AR LINA0334) The Prolonged Walking Test found decreased stride length and left antalgia which increased with farther distances. *Id.*

The additional office visits documented in Plaintiff's appeal include:

> A November 29, 2016 appointment with Dr. Bottros at the Pain Management Center for "pain in lower back, bilateral hip and bilateral knee to calf." Plaintiff's pain was continuous, and she described it as "aching, sharp, gnawing, stabbing, tender nagging, exhaustive, burning, unbearable and miserable"; rating her pain as a seven out of ten on the date of her visit and an eight out of ten on average. Plaintiff was offered

methadone. (Plaintiff Facts ¶¶ 160-161) The treatment note indicates that Plaintiff was last seen on October 4, 2016 and had bilateral SIJ injections which provided 40 percent relief for two weeks. (Defendant Facts, at 45 citing AR LINA0374).

A December 7, 2016, treatment note from Dr. Buchowski stating that Since her surgery, she has developed sacroiliitis and left femoral nerve, saphenous nerve and genicular nerve neuropathy. She has been working with Dr. Michael Bottros on this. She has had a number of different blocks and injections. She uses a nerve stimulator around her left knee and states that this has been quite helpful. She is being considered for a spinal cord stimulator. She states that as a result of these issues, she has been unable to work secondary to her pain, need to lie down frequently, need to ice, etc. In fact, she has been fired from her job as a result of not being able to perform her duties. She states that despite these troubles, her radicular/neurogenic claudication symptoms, which she had prior to the operation, have for the most part resolved. Her back pain has to some degree also improved. (Defendant Facts ¶ 62; AR LINA0371).

Plaintiff visited the Pain Management Center on January 10, 2017 for low back pain that radiates to the left thigh. (Plaintiff Facts ¶ 164). During this visit she completed a Patient Health Questionnaire and rated her pain as very severe as to greatly interfere with her activities of daily life. (Plaintiff Facts ¶¶164-65, citing AR LINA0389).

Plaintiff saw Dr. Bottros again on February 3, 2017 for neck pain radiating into her soldiers and received a cervical epidural steroid injection at the C7 vertebrae. Plaintiff additionally stated during this visit that she was still experiencing lower back pain that was making movement difficult." (Plaintiff Facts ¶¶ 167-69).

On February 13, 2017 Plaintiff filed out another Patient Health Questionnaire and reported that she experienced pain most of the time, that the pain during activities of daily living were a six or severe and the only thing that made her pain better was laying down/ ice. *Id.* ¶ 169.

On March 24, 2017, Plaintiff met with Dr. Bottros. During this visit they discussed pain management therapies and coordination of multidisciplinary pain management. Dr. Bottros' note discusses the Plaintiff's last visit to him on February 3, 2017, in which she had CEST which reduced her neck pain by sixty percent. The note further states that Plaintiff did four sessions of PT and is now doing HEP and that Plaintiffs pain decreased by fifteen percent since she started taking NSAIDs.

(Defendant Response at 47-48; Plaintiff Facts ¶ 170.)

After receiving Plaintiffs appeal Defendant sent Plaintiff's medical records for another peer review. (Defendant Facts ¶ 73). The Peer review was conducted by Dr. Ephraim K. Brenman, Physical Medicine and Rehabilitation. *Id.* ¶ 74. Dr. Brenman reviewed Plaintiff's medical records and spoke with Dr. Buchowski and Dr. Ellena, Plaintiff's primary care physician. *Id.* ¶¶75-76, citing AR LINA 0420-425.[15] Dr. Brenman did not speak with Dr. Bottros. (Plaintiff Facts ¶ 172). Based on Plaintiff's medical, Dr. Brenman came to the following conclusions:

> The claimant, in my medical opinion, can lift and carry up to 10 pounds. The claimant can sit up to 8 hours a day after 1 hour at a time needing a few minute breaks to stop and stretch. While sitting, there are no restriction to reaching at desk level, fingering, and keyboarding. The claimant can reach above shoulder level without any restrictions and [is] able to reach at waist level occasionally. The claimant can stand and walk up to 3 [hours] at the [l]east up to 30 minutes at a time needing a few minute breaks to stop and stretch. The claimant can crouch and go up and down stairs occasionally. This is due to the fact that the claimant was improving in terms of walking distance according to Dr. Buchowski. The claimant also only has tenderness on S1 joint on examination, there is no weakness of atrophy on examination. The claimant mainly complains of pain after a T10-S1 fusion posterior and L3 and L5 laminectomy and also has pain in the left knee after having genicular nerve radiofrequency neurotomy. The functional capacity examination also finds the claimant could function at a sedentary level of work. In my medical opinion, there is no documentation for any significant medication side effects causing impairment.

(Defendant Facts ¶ 76, quoting AR LINA0420-425). Defendant additionally got the opinion of Janet Moore, MS, CRC Rehabilitation Specialist as to the sedentary nature of Plaintiff's job. *Id.* ¶ 78. She concluded that Plaintiff's job was sedentary. *Id.* ¶ 79. Defendant further asked Cindy Horzog, MS CRC Rehabilitation Specialist whether Plaintiff could perform her sedentary position with the restrictions that Dr. Brenman had recommended. *Id.* ¶ 80 (citing AR LINA0065-66). She concluded that:

---

[15] Defendant asserts that Dr. Brenman reached out to four physicians and that two did not respond. Defendant Facts ¶¶75-76. Defendant does not provide the names of the two physicians that did not respond.

> [Plaintiff]'s occupation is a Sedentary occupation per the DOT, which requires lifting, carrying, pushing, pulling 10 lbs. occasionally, and mostly sitting. Sedentary occupations may also involve standing or walking for brief periods of time. Occupation will allow for stretch breaks. Therefore, the R&Ls as noted above are consistent with the physical demands of [Plaintiff]'s occupation.

(*Id.* ¶ 81, citing AR LINA0065-66). Defendant denied Plaintiff's first appeal on May 22, 2017.

*Id.* ¶ 82, citing AR LINA0441-444). The denial letter concluded:

> Disability is determined by medically supported limitations and restrictions which would preclude you from performing the duties of your occupation. We do not dispute you may have been somewhat limited or restricted due to your subsequent diagnoses and treatment; however, an explanation of your functionality and how your functional capacity continuously prevented you from performing the duties of your occupation from January 16, 2016 through the present and beyond was not clinically supported. The presence of a condition diagnosis or treatment does not necessarily equate to a presence of a disabling condition or decreased level of functionality. As such, we are affirming our previous decision of December 1, 2016 within the meaning and terms of your group LTD policy.

(*Id.* ¶ 86, quoting AR LINA0441-444).

### C. Plaintiff's Second Appeal

Plaintiff appealed Defendant's Denial of her first appeal on November 17, 2017. *Id.* ¶ 88. On May 22, 2017, Plaintiff notified the Defendant that she had been approved for trial implantation of a spinal stimulator. (Plaitniff Facts ¶189). Plaintiff states that her insurance had deemed the procedure medically necessary. *Id.* Plaintiff's second appeal included:

(1) Defendant's August 17, 2016 Approval Letter;
(2) Medical Request Form and Physical Ability Assessments that had previously been submitted by Dr. Buchowski in August of 2016;
(3) The Functional Capacity Evaluation (FCE).
(4) Plaintiff's original appeal from April of 2017;
(5) Medical records from Dr. Bottros from March of 2017 until September 28, 2017;
(6) Medical records from an appointment with psychologist, Beverly Field on April 13, 2017; and
(7) A letter from Dr. Buchowski dated November 17, 2017.

(Plaintiff Facts ¶ 207).

Plaintiff's records submitted in her second appeal indicate that she saw Dr. Bottros for low back pain and left knee pain on March 24, 207; that she then saw him again on July 3, 2017 for low back pain and left knee pain; and that Dr. Bottros performed a Nevro SCS trial on the Plaintiff to treat her pain. (Plaintiff Facts ¶¶ 208-211). Plaintiff again saw Dr. Bottros on July 10, 2017, for pain management that was "exacerbated by movement and improved with laying." (Plaintiff Facts ¶ 212, citing AR LINA0509-510). Plaintiff also reported to Dr. Bottros that the SCS trial relieved her pain by seventy percent, increased functioning, and the ability to stand for one hour which she was not able to do before the trial. (Defendant Response, at 61).

On August 24, 2017, and September 14, 2017, Plaintiff saw Dr. Bottros for low back and knee pain. (Plaintiff Facts ¶¶ 213-214). Plaintiff had the SCS implantation on September 7, 2017 and followed up with Dr. Bottros on September 28, 2017. *Id.* ¶¶ 214-215. Plaintiff reported that she had "multiple painful areas, left knee and left hip pain radiating to left buttocks and sacral areas, also with right sacral pain. (Plaintiff Facts ¶ 215). On April 13, 2017, Plaintiff saw Dr. Beverly Field, a psychologist. (Plaintiff Facts ¶ 216). Dr. Field concluded that "there [were] no significant psychological factors present that would contraindicate a trial of spinal cord stimulation." (Defendant Response, at 62, citing AR LINA0502). Dr. Buchowski's letter stated that:

> [Plaintiff's] postoperative course has been made difficult by the development of sacroiliitis along with left femoral, saphenous, and genicular nerve neuropathy. These complications have led to sustained pain and loss of function despite a continuing multi-modality treatment plan which includes physical therapy, injections, medications, TENS unit, etc. As a result, she has been unable to perform her job duties as previously required secondary to pain and difficulty standing and ambulating. She has not been cleared to return to work full-time, especially in the manner that she was working prior to surgery. In

> addition, due to the continued pain and discomfort, she is currently scheduled to undergo a follow up surgical operation on January 25, 2018. A this point it is unclear if and when her condition will improve …

(Plaintiff Facts ¶ 217, citing AR LINA0528)(emphasis omitted)

On December 21, 2017, Plaintiff additionally submitted a medical record from November 1, 2017 from Dr. Buchowski, which stated that the Plaintiff remained unable to work and had undergone a spinal cord stimulator placement. (Defendant Facts ¶ 89, citing AR LINA0670-673). Dr. Buchowski additionally notes that plaintiff is ambulating normally and that he is considering removing the left iliac screw with the hopes that this will help her left lower extremity symptoms. I am uncertain whether removal of the screw will be helpful. I discussed with the patient the medications for the procedure, the potential risks, expected benefits, and alternatives to treatment. Given her persistent pain, she would like to proceed with left iliac screw removal. (AR LINA673).

Defendant submitted Plaintiff's second appeal to Dr. Christopher Wilson, Physical Medicine and Rehabilitation, for review. (Defendant Facts ¶ 93). Dr. Wilson reviewed Plaintiff's file and spoke directly with Dr. Buchowski. Dr. Buchowski stated:

> [S]tructurally [Plaintiff's] spine is stable, and the surgery being planned is removal of a screw from her prior fusion in the ilium since most of her continued lower back pain is in the sacroiliac area. He also felt that because of [Plaintiff's] stable spine, she should be able to return to sedentary level work activities after healing which in patients with uncomplicated spines could be 6 to 8 weeks after surgery, but with [Plaintiff's] more complicated spine history, healing after this surgery could be more than 12 weeks.

(Defendant Facts ¶ 95, citing AR LINA0692-698).

After review, Dr. Wilson concluded that:

> …as of 12-1-2016 through 11-16-2017, [Plaintiff] was physically functionally impaired from her thoracolumbar spine disease…by 12-1-2016, she should have healed from the January 2016 surgery and have

been able to return to work duties full time with Restrictions and Limitations or R and Ls at a level that was determined by the FCE that she had done in January of 2017. But, because of the 11-17-2017 correspondence by Dr. Buchowski, which noted that [Plaintiff] would need a third surgery to her lumbar spine in January of 2018, it is my opinion that on the date of this declaration by Dr. Buchowski…that [Plaintiff]'s physical impairment at this point is to a level where she should be taken off all work activities starting 11-17-2017, through the time of the surgery, as well as a period of at least 3 months and maybe more to heal from the surgery before returning back to any work activities….I believe that she will need at least 3 months and possibly more to heal, as she has a complicated spine condition with complications after the first surgery that led to a second surgery, and she will have had three surgeries in 2 years if the third is done in January 2018…

(Defendant Facts ¶ 96, quoting AR LINA 0692-698). Confusingly Dr. Wilson goes on to state that despite Plaintiff being "physically functionally impaired" it his opinion that:

[I]t was appropriate for [Plaintiff] from 12-1-2016 through 11-16-2017 to have work capacity full time with appropriate R and Ls because there was no significant functional measured limitations in the office notes of the physicians who treated [her] during this time period…I feel that she could perform use of lower extremities for foot controls at a frequent level during the 8 hour work day.

(*Id.* ¶ 97, quoting AR LINA0692-698). Dr. Wilson then goes on to state that he "believed prolonged sitting could make her back pain worse" but ultimately concludes that Plaintiff "could have done constant sitting through the time period of 12-1-2016 through 11-16-2017 as long as accommodations could have been given where she could stand/stretch/change positions for 5 minutes for every 30 minutes during the 8 hour work day…" *Id.* On February 7, 2018, Defendant again denied Plaintiff's appeal upholding its earlier denial because Plaintiff was not "totally and continuously disabled as of December 1, 2016, and forward". *Id.* ¶¶ 102, 108.

## II.    Merits of Plaintiff's Claim for Long-Term Disability Benefits

Defendant initially approved Plaintiff's claim for LTD benefits based upon the medical evidence Plaintiff had submitted in her STD claim. Defendant conclusively determined that

Plaintiff was disabled from January 2016 through August 2016. Defendant then determined that at some time between August 2016 and December 1, 2016, Plaintiff was no longer disabled. "An insurer who first approves LTD benefits, then later terminates them, must show a 'significant' change in claimant's condition making her no longer eligible for benefits." *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002). The absence of changed circumstances weighs against the propriety of insurers changed position. *Id.* at 589; *See, Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840-41 (8th Cir. 2001)(determining that termination of benefits was not justified absent change in circumstances). Plaintiff asserts that there has not been any changed condition that justifies Defendant's termination of Plaintiff's LTD benefits. (ECF No. 36, at 20).

The initial denial of Plaintiffs LTD benefits on December 1, 2016, was based on the opinion of Dr. St. Clair that the Plaintiff's medical records lacked measured examination findings, imaging, or test results that support functional limitations. (Defendant Facts ¶ 57). Specifically, the denial letter sent to the Plaintiff states that "the medical on file does not support a significant level of functional deficits that would preclude [her] from returning to [her] occupation as a Vice President of Managed Care" (Defendant Response at 36-37; Plaintiff Facts ¶ 136, citing AR LINA0315). Similarly, Defendant denied Plaintiff's first appeal because the Defendant found that the Plaintiff lacked medically supported limitations and restrictions. (Defendant Facts ¶ 86). Defendant's decision regarding Plaintiff's second appeal acknowledged that Plaintiff was functionally impaired but nonetheless determined that her physical limitations prior to November 2017 were not sufficient to render the Plaintiff disabled under the Policy. Defendant's final determination concluded that Plaintiff was disabled as of November 2017 and may have continued to be disabled up to and including three months following her January 2018

surgery but denied Plaintiff's claim because she was not continuously disabled. Therefore, the question before the Court is whether Plaintiff's condition between August 2016 and December 2016 was so different from her condition when LTD benefits were initially approved in August of 2016 as to warrant the subsequent denial of her benefits.

Even though Plaintiff's STD claim arose from her January 2016 surgeries, Plaintiff's LTD claim is focused on her chronic pain following her initial spinal surgeries. Following the August 2016 approval of her LTD benefits, Plaintiff went to her physicians for continuing low back pain, lower left extremity pain that worsened between September and November of 2016, and difficulty walking (AR LINA0194-96; 0212-13; 0258-264; 0371). Dr. Buchowski determined that the Plaintiff could not bend, twist... or stay in one position for more than 30 minutes at a time, and that Plaintiff's "pain limits her from being able to return to fulltime work." (AR LINA0194-96). Dr. Buchowski specifically diagnosed the plaintiff with sacroiliitis and left femoral nerve and genicular nerve neuropathy following her January 2016 surgeries. (AR LINA0371). Echoing Dr. Buchowski's diagnoses, Dr. Bottros also diagnosed Plaintiff with sacroiliitis and performed sacroiliac nerve joint injections (AR LINA0261-262). "While an ERISA plan administrator need not accord special deference to a treating physician's opinion, ... an administrator may not 'arbitrarily refuse to credit a claimant's reliable evidence, including a treating physician.'" *Wilcox v. Liberty Life Assur. Co. of Bos.*, 552 F.3d 693,701 (8th Cir. 2009)(quoting *Black and Decker Disability Plan v. Nord*, 538 U.S. 822,825 (2003)).

Beyond the recommendations and treatments of Plaintiff's treating physicians, Plaintiff submitted evaluations of her functional ability through her July 19, 2016 Physical Ability Test and her January 23, 2017 FCE to show her level of functioning between August 2016 and November 2017. Plaintiff's Physical Ability Test and her FCE indicate that the Plaintiff lacked

the ability to sit for more than one-third of the work day. Plaintiff asserts that because Plaintiff's job is sedentary, her inability to sit for long periods of time indicate that she is disabled from a sedentary position. Defendant, however, asserts that although Plaintiff's Physical Ability Test and FCE indicate that she cannot consistently sit for long periods, Plaintiff ought to be able to work full-time by taking breaks to stand and stretch throughout the day.[16] "A 'FCE measures the residual occupational abilities of a patient per National Institute for Occupational Safety and Health Guidelines. *Michael v. American Intern. Group Inc.,* No. 4:05 CV 02400 ERW, 2008 WL 4279582 (E.D. Mo. Sept. 15, 2008) (citing *Ebert v. Reliance Standard Life Ins. Co.*, 171 F. Supp. 2d 726, 732 (S.D. Ohio 2001)). "[T]he usefulness of the results of an FCE are extremely limited. It is important to note that 'tests of strength such as a [FCE] can neither prove nor disprove claims of disabling pain.'" *Id.*, citing *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F.Supp. 2d 261, 269 (W.D.Pa. 2008). Here, Plaintiff's Physical Ability Test and FCE are not so conclusive as to weigh against Plaintiff's claims of debilitating pain, and do not clearly indicate changed circumstances in Defendant's favor. Furthermore, an FCE that suggests that Plaintiff is unable to sit for more than one-third of her workday may support Plaintiff's claim that she remained disabled. *See, Seitz v. Metro Life Ins. Co.*, 433 F.3d 647 (8th Cir. 2006)(Claimant who could not sit for more than two hours but whose job required six hours of sitting was determined to be "physically unable to fulfil at least one material aspect of his job").

The opinions of Plaintiff's treating physicians correspond with Plaintiff's reports of persistent pain and correspond with the treatments Plaintiff received. Plaintiff was prescribed

---

[16] Defendant's Peer reviewers disagreed as to the exact amount of time the Plaintiff could sit and how frequently breaks would need to be taken. *See, e.g.* AR LINA0075-76 (Dr. St. Clair believes that Plaintiff is capable of "constant sitting" and "occasional standing and walking" ); AR LINA0420-25 (Dr. Brenman determines that Plaintiff can sit for 8 hours a day if after each hour she takes a break to stop and stretch, and can stand and walk only 30 minutes at a time with breaks to stop and stretch); Defendant Facts ¶¶ 102, 108 (Dr. Wilson states that "prolonged sitting" could worsen Plaintiff's back pain and that she would have to change positions, stand or stretch for five minutes every 30 minutes).

drugs, injections, a spinal cord stimulator placement, and eventually additional surgery for her pain. While pain is difficult to quantify, the Court can evaluate Plaintiff's course of treatment regarding that pain. It is also telling that Defendant's own peer reviewers, and decision letters indicated that Plaintiff was suffering from functional limitations. On April of 2016, Defendant noted that Plaintiff was "[u]nable to tolerate anything regarding sitting, [or] standing"; that in May of 2016 Plaintiff was unable "to walk at all"; that in initially granting Plaintiff's LTD benefits a nurse case manager for the Defendant noted Plaintiff's "significant back history" and "antalgic gait" "ongoing pain/limits to function" "gait deficits/ continued pain/ treatments limiting ADL"; that in their approval of LTD benefits in August of 2016, Defendant noted Plaintiff's "medical on file demonstrates a functional loss"; Dr St. Clair notes that Plaintiff is functionally limited; and Dr. Wilson stated that on December 1, 2016, at the time of Defendant's denial of Plaintiff's LTD benefits, she was "physically functionally impaired from her thoracolumbar spine diseases" despite ultimately concluding that Plaintiff should have been healed and able to work full time. (AR LINA0075-76, 692-698, 882, 884, 890, 1113).

The preponderance of the evidence demonstrates that Plaintiff's pain is persistent, disabling and ongoing not only from January of 2016 through August of 2016 but from August 2016 through at least January 2018. The medical evidence presented by the Plaintiff cannot be outweighed by the inconclusive results of her FCE. The Court therefore finds that Plaintiff was continuously disabled following the initial approval of her LTD benefits. Plaintiff has established that the Defendant's decision to not pay Plaintiffs disability benefits once she was no longer earning 80% of her indexed salary was erroneous under the terms of the Plan and in light of all of the evidence presented. The Court will therefore enter Judgement in favor of the Plaintiff on Count I of Plaintiff's Complaint. Plaintiff is entitled to benefits due after August 18, 2016.

Plaintiff is also entitled to future benefits under the Plan to the extent that she continues to qualify under the terms of the Plan.

### III. Plaintiff's Claim for Attorneys' Fees under 29 U.S.C. § 1132(g)

Plaintiff asserts that the Defendant's denial of Plaintiff's claim constitutes bad-faith and attorneys' fees should therefore be awarded. (ECF No. 36, at 31). In evaluating whether to award attorneys' in ERISA cases the Eighth Circuit looks to the following factors:

> (1) The degree of culpability or bad faith of the opposing party;
> (2) The ability of the opposing party to pay attorneys' fees;
> (3) Whether an award of attorney fees against the opposing party might have a future deterrent effect under similar circumstances;
> (4) Whether the parties requesting attorney fees sought to benefit all participants and beneficiaries of the plan or to resolve a significant legal question regarding ERISA itself and
> (5) The relative merits of parties' positions.

*Star v. Metro-Systems, Inc.*, 461 F.3d 1036,1041 (8th Cir. 2006).

Plaintiff alleges that Defendant has acted in bad faith due to its conflicting rationales for denying her claim. (ECF No. 36, at 31). Plaintiff additionally asserts that Defendant failed to turn over documentation regarding Plaintiff's August 18, 2016 LTD approval. *Id.* at 32. Defendant "acknowledges that production of the full Record during litigation was delayed due to inadvertent administrative oversights…" (ECF No. 32, at 22). Defendant asserts that its failure to produce documents nevertheless did not prevent the Plaintiff from full and fair review. *Id.* at 23. While Defendant's mismanagement of its records regarding Plaintiff's initial approval of LTD benefits weighs in favor of bad faith it does not conclusively show bad faith on the part of the Defendant. Furthermore, bad faith is only one of the factors the Eighth Circuit has asked District Courts to consider in awarding attorneys' fees, with only Defendant's ability to pay weighing heavily in Plaintiff's favor. Although the Court has determined that Defendant's finding that Plaintiff was not continuously disabled and Defendant's denial of Plaintiff's benefits was

improper, the Defendant did so by relying on legitimate portions the Policy. Therefore, the Court will decline to award attorneys fees in this case.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgement (ECF No. 31) is **GRANTED in part** and **DENIED in part.** The Court will therefore enter Judgement in favor of Plaintiff on Count I of Plaintiff's Complaint. Plaintiff is entitled to benefits under the Plan since August 18, 2016.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgement (ECF No. 30) is **GRANTED in part** and **DENIED in part**. The Court grants Defendants Motion in so much as it relates to Count II of Plaintiff's Complaint for Attorneys' Fees; Count II is therefore **DISMISSED**

Dated the 29th day of August, 2019.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE